

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-2005

# Vente v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-4731

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"Vente v. Atty Gen USA" (2005). *2005 Decisions.* Paper 767.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/767

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-4731

RODOLFO VENTE VENTE,

Petitioner

v.

\* ALBERTO R. GONZALES, Attorney General of the
United States

Respondent

\*Substituted pursuant to Rule 43c, F.R.A.P.

On Appeal from an Order entered before
The Board of Immigration Appeals
(No. A79 092 668)

Argued December 7, 2004

Before: AMBRO, and VAN ANTWERPEN, <u>Circuit Judges</u>
SHADUR,** <u>District Judge</u>


(Opinion filed July 22, 2005)

Philippe Weisz, Esquire (Argued)
American Friends Service Committee
Immigrant Rights Program
89 Market Street, 6th Floor
Newark, NJ   07102

       Attorney for Petitioner

Peter D. Keisler
   Assistant Attorney General
Scott R. McIntosh, Esquire
H. Thomas Byron, III, Esquire (Argued)
United States Department of Justice
Civil Division, Appellate Staff PHB 9134
601 D Street, N.W.
Washington, D.C.  20530-0001

Douglas E. Ginsburg, Esquire
John D. Williams, Esquire
United States Department of Justice
Office of Immigration Litigation

---

       **Honorable Milton I. Shadur, United States District
Judge for the Northern District of Illinois, sitting by
designation.

P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

Attorneys for Respondent

_____

OPINION OF THE COURT

_____

AMBRO, Circuit Judge

Rodolfo Vente Vente petitions for review of the decision by the Board of Immigration Appeals ("BIA") denying his claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Because the BIA's decision mischaracterized the nature of Vente's asylum claim, rendering meaningful review of that decision impossible, we grant the petition.

## I. Factual Background & Procedural History

Vente is a native of Colombia. He was born in 1973 in Timbiqui, an area where the majority of the population is Afro-Colombian. Vente lived in Cali, one of the largest cities in Colombia, from 1993 to 1998. Beginning in January 1998, he

lived and worked in Cisneros, a small, predominantly Afro-Columbian agricultural community.

From mid-1999 to November 2000, Vente attended meetings of a community group in Cisneros. He testified before the Immigration Judge ("IJ") that "the purpose of these meetings was to ask to the government to give some help for health purposes, also schools, to work [on] the water . . . system. Also to get certificates of the land that we were working on." Vente stated that he stopped going to these meetings because paramilitary groups said that they were going to kill those who attended and told people in the community that they should abandon their land. Vente also testified that he was shot in the leg in March 1999, but he did not know who shot him.

In December 2000, Vente received a threat from one of the paramilitary groups accusing him of collaborating with guerillas. He testified that he believed the group thought he was a collaborator because he had attended the community group meetings. According to Vente, that December a paramilitary cadre destroyed the police station in Cisneros, killed three police officers, and conducted a massacre in which nine people were killed and twelve or thirteen people were wounded. These events, coupled with the threat he had received, prompted Vente to think about leaving the area.

Vente reported the threat against him to the human rights office in Buenaventura, the region of Colombia in which

4

Cisneros is located, on January 22, 2001. This office was unable to offer him any protection and sent him to talk to other government authorities. The district attorney's office was also unable to help Vente, so he returned home. Upon his return, his brother informed him that two men had been looking for him.

Vente then went to Cali to seek once more protection from government authorities and was again unsuccessful. He did receive some assistance in finding shelter and food from a charitable organization, and he stayed in Cali for a brief period. On February 7, 2001, Vente returned to Cisneros to see his mother, who was ill. At this time, his uncle told Vente that it was not advisable for him to stay in Cisneros for long because Vente had been sent a note from a paramilitary group saying that it was in the town and that there were other armed groups around the town. A note dated February 6, 2001, from the United Auto-Defenses of Colombia stated that the group knew Vente had returned to the area and also warned him that he would suffer consequences if he did not leave the region.

Vente returned to Cali but testified that he did not feel safe there. On February 20, 2001, he left Colombia and flew to the United States. The Immigration & Naturalization Service ("INS")[1] served Vente with a Notice to Appear on March 1,

[1]As a result of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), the INS has ceased to exist as an agency within the Department of Justice, and its

5

2001, and he conceded removability but applied for asylum, withholding of removal, and relief under the CAT. A hearing on these claims was held before the IJ on February 21, 2002, and he rendered an oral decision denying Vente relief.

The IJ determined that Vente had not suffered past persecution even assuming that his testimony was credible regarding the threatening letters he received from paramilitary groups. The IJ further found that some parts of Vente's story were credible while others were not. For example, the IJ did not credit Vente's statement in his asylum application that paramilitary groups were still looking for him after he left Cisernos. The IJ also noted the gap of eighteen months between the time that Vente started attending the community group meetings and the time he started receiving threats. Finally, the IJ concluded that Vente had an obligation to live elsewhere in Colombia, which he did not do, before coming to the United States.

Vente appealed, and the BIA also denied his claims for relief. It overturned the IJ's "mixed credibility" finding as to Vente's testimony, noting that the IJ's finding appeared to be based on Vente's statement that he was shot in the leg in March 1999 and thus the finding had to be vacated as Vente had not

enforcement functions have been transferred to the Bureau of Immigration and Customs Enforcement within the Department of Homeland Security.

attempted to tie that event to his claims for relief. The BIA went on to determine that, even though Vente was credible, he had not satisfied his burden of proof.

The BIA also concluded that Vente had not suffered past persecution, noting that: (1) he conceded that he had never been personally harmed by any paramilitary group; and (2) his ability to live in Cali from 1993 to 1998, and again just before his departure from Colombia, suggested "either that the 'threat' of persecution was not country-wide or that he was not a serious target of political violence."[2] The BIA then concluded that Vente also had not established a well-founded fear of persecution because (1) the general unrest in Colombia did not provide a basis for asylum or withholding of removal, and (2) Vente's "two brothers and his parents remain in Colombia and there is no evidence that they have been harmed."

Vente's petition for review of the BIA's denial of his asylum claim is now before us.[3]

_____

[2]Vente does not appear to challenge the BIA's determination that he had not suffered past persecution. *See Pet'r Br.* at 36 (arguing that the IJ erred in construing Vente's asylum claim as being based on past persecution rather than on his fear of future persecution).

[3]Although Vente makes a general request that we reverse the BIA's order in its entirety, his petition for review focuses on his asylum claim and makes no specific argument that the BIA's

7

## II. Jurisdiction & Standard of Review

Under 8 U.S.C. § 1252(a), we have jurisdiction to hear a petition for review from a final order of the BIA. We must uphold the BIA's factual findings if they are supported by substantial evidence. *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 296 (3d Cir. 2004). That is, the BIA's denial of asylum can be reversed "only if the evidence presented by [petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *see also Abdille v. Ashcroft*, 242 F.3d 477, 484 (3d Cir. 2001) ("[T]he BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it.").

## III. Discussion

The Attorney General and his delegates may grant asylum to any alien who qualifies as a refugee under the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158(b)(1). A refugee is an alien who is "unable or unwilling" to return to his or her

---

denials of his claims for withholding of removal and CAT protection were incorrect. We therefore deem those claims waived and address only the asylum claim. *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (a passing reference to an argument in a party's brief is insufficient to bring the issue before this Court).

country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Aliens have the burden of supporting their asylum claims. *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). "Testimony, by itself, is sufficient to meet this burden, if 'credible.'" *Id.* (citing 8 C.F.R. § 208.13(a)).

To establish eligibility for asylum, an applicant must demonstrate past persecution by substantial evidence or a well-founded fear of future persecution that is both subjectively and objectively reasonable. *Lukwago v. INS*, 329 F.3d 157, 177 (3d Cir. 2003). The persecution must be "committed by the government or forces the government is unable or unwilling to control." *Gao*, 299 F.3d at 272 (internal quotation omitted).

We now turn to the arguments Vente advances in favor of reversal: (1) the BIA erred in failing to conduct an independent corroboration inquiry after overturning the IJ's negative credibility determination; (2) the BIA's determination that he did not meet his burden of proof was based on a factually flawed characterization of his asylum claim; and (3) the BIA erred in determining that Vente had an internal resettlement alternative.

A.    *Corroboration*

Vente asserts that the BIA committed reversible error

under *Miah v. Ashcroft*, 346 F.3d 434 (3d Cir. 2003), and *Abdulai v. Ashcroft*, 239 F.3d 542 (3d Cir. 2001), because it did not conduct an independent corroboration analysis after reversing the IJ's mixed credibility determination and finding that he had testified credibly. This contention, which his counsel acknowledged at oral argument was not Vente's strongest position, we easily dispense with.

In *Abdulai*, we set out a three-part inquiry that the BIA must engage in when it determines that the production of corroborating evidence is necessary for an otherwise credible asylum applicant to meet his/her burden of proof. 239 F.3d at 554.[4] Subsequently, in *Miah* we held that when the BIA rejected an IJ's adverse credibility finding, it should have (1) reached its own conclusions on corroboration by performing an *Abdulai* analysis, or (2) remanded the case to the IJ for a new corroboration analysis, instead of merely reiterating the IJ's findings on whether there had been sufficient corroboration. 346 F.3d at 440. Our concern in *Miah* was the effect that a changed credibility determination—from unfavorable to

---

[4]In such a case, the BIA must conduct the following analysis: "(1) an identification of the facts for which it is reasonable to expect corroboration; (2) an inquiry as to whether the applicant has provided information corroborating the relevant facts; and if he or she has not, (3) an analysis of whether the applicant has adequately explained his or her failure to do so." *Abdulai*, 239 F.3d at 554 (internal quotation marks omitted).

10

favorable—would have on the degree of corroboration required of an asylum applicant when the IJ had *already* required the submission of corroborating evidence. *Id.*

By contrast, corroboration was never an issue in Vente's case. Neither the IJ nor the BIA requested the submission of corroborating evidence, and the case was decided at both levels on the basis of Vente's testimony alone. Nothing in *Miah* suggests that the BIA, after reversing an IJ's credibility finding, must always conduct an independent corroboration analysis (or remand to the IJ for a corroboration analysis) when corroborating evidence was never an issue in the case. Indeed, such a rule would make mandatory what we characterized in *Abdulai* as an optional inquiry into corroborating evidence. *See* 239 F.3d at 554 (holding that "the BIA *may sometimes* require otherwise-credible [asylum] applicants to supply corroborating evidence in order to meet their burden of proof") (emphasis added).

Because *Miah* and *Abdulai*, taken together, do not stand for the proposition that the BIA must always conduct an independent corroboration analysis after vacating an IJ's adverse credibility finding, Vente's argument that the BIA should have performed such an analysis in his case, where corroboration was never an issue, is unpersuasive. What the BIA did here—determining that Vente testified credibly but still did not meet his burden of proof—is not unusual. *Cf. Ahmed v. Ashcroft*, 341 F.3d 214, 216 (3d Cir. 2003) (affirming BIA

decision holding that alien who testified credibly nonetheless did not satisfy the burden of proof required of asylum applicants because he had not shown that the adverse treatment he feared rose to the level of persecution). We must therefore consider Vente's argument that the BIA's determination was incorrect because it was based on a factually flawed characterization of his asylum claim.

B.    *The Asylum Claim*

As stated earlier, the BIA's decision that Vente did not have a well-founded fear of persecution if returned to Colombia—and that he was therefore not eligible for asylum—rested on two findings: (1) the general unrest in Colombia did not provide a basis for asylum; and (2) Vente's parents and brother remain in Colombia, and there is no evidence that they have been harmed. These findings miss the mark.

First, the record clearly shows that Vente's asylum claim is based not on allegations of general social unrest in Colombia but on the specific threats that he received from paramilitary organizations that identified him as having collaborated with the guerillas.[5] The Government's argument to the contrary—that

_____

[5]As discussed above, the persecution that Vente fears must be committed by the Colombian government or forces that government is unwilling or unable to control in order for him to

12

the BIA's finding that Vente's claim was based on general unrest is supported by substantial evidence because some of the threats from the paramilitaries in the record are directed generally at residents of the area in which Vente lived—is unavailing. The Government is correct that some of the threats from the paramilitary groups were directed at the residents of the region in which Vente lived. *See* A.R. at 144–47 (letters from the "United Auto Defense of Colombia" threatening residents of "the region of Valle del Cauca"). However, one of the threats includes Vente's name on a list of people identified by a paramilitary organization as having collaborated with the guerillas. *See id.* at 142–43. Another of the threats is specifically directed against Vente and states that he should not have returned home to see his mother. *See id.* at 118 (letter addressed to "Mr. Rodolfo Vente Vente[,] Known Residence[,] Buenaventura Valle del Cauca" and ordering him to leave the region or "suffer the consequences").[6]

_____

be eligible for asylum. The Government makes no argument that Vente is not eligible for asylum because the persecution he fears is not attributable to such actors. In addition, there is evidence in the record that the Colombian government has done little to address the problem of links between its military and paramilitary groups. *See* A.R. at 268 (Human Rights Watch, *The "Sixth Division": Military-[P]aramilitary Ties and U.S. Policy in Colombia*, Sept. 2001).

[6]The translation of this threat, dated February 6, 2001, reads in pertinent part as follows:

For your information, the central command of the united auto-defenses of Colombia-AUC, have met with the purpose of discussing your personal disobedience of having returned to the department of the Valley of Cauca after having named you a person not apt to live in this department when it was found that you were an auxiliary to the guerilla which operates in this zone according to the investigations done by this command. The Central Command has determined for the first and only time to pardon your life taking into account the delicate state of health of your mother. But at the same time, we demand that you disappear from the department, to not return to the zone you were asked to vacate nor return to the place where your mother lives, for the second and last time, in a 24 hour term, starting today, 6th of February 2001, at 11:00[] p.m.[;] otherwise, we are not responsible and you will suffer the consequences.

Moreover, Vente's testimony focused on the threat in which he was named as a collaborator. The general social and political unrest in Colombia was a component of his testimony only insofar as he testified that paramilitary groups operate throughout the country and that the Colombian government did not have the resources to protect him. In any event, there is no indication in the BIA decision that its conclusion that Vente could not succeed—because general unrest does not provide a basis for asylum—was drawn from the more general threats in the record.

Second, the BIA's focus on the fact that Vente's family members remain in Colombia, and that they apparently have not suffered any harm, is misplaced. The status of Vente's family is irrelevant to an inquiry into whether his *own* fear of persecution by paramilitary organizations upon return to Colombia is subjectively and objectively reasonable. Vente does not claim that the persecution he allegedly faces is on account of kinship ties (in other words, Vente does not argue that he fears persecution on account of membership in a particular social group) or that his family members were ever targeted in the way that he was.

In sum, the BIA's findings, as discussed above, are wholly unsupported by the record and essentially ignore the actual basis of Vente's asylum claim. "When deficiencies in the

A.R. at 118.

15

BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning." *Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003). That is the situation in which we find ourselves here. Given that Vente's asylum claim is based on the specific threats he received from paramilitary groups in Colombia, it is unclear why the BIA even addressed the general unrest in Colombia or whether members of Vente's family suffered harm. We must therefore remand this case to the BIA for a fresh look at Vente's asylum claim—one that focuses on the true underpinnings of that claim.

C.      Internal Resettlement Alternative

Although we have concluded that the deficiencies in the BIA's analysis of whether Vente has a well-founded fear of persecution mandate a remand of this case to the BIA, we briefly address his argument that the BIA erred in determining that he had an internal resettlement alternative. Under the governing asylum regulations, "[a]n applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality." 8 C.F.R. § 1208.13(b)(2)(ii). An applicant who has not established past persecution "bear[s] the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored." 8 C.F.R. § 1208.13(b)(3)(i).

16

The IJ concluded that Vente had an obligation to relocate within Colombia. In its analysis of whether Vente had established past persecution, the BIA noted that Vente had "lived in Cali from 1993 until 1998, and again prior to his departure to Colombia in February of 2001; he testified that he had no problems with paramilitaries while living in Cali." The BIA went on to "find that [Vente]'s ability to live in Cali for a number of years, and immediately prior to his departure from Colombia, suggests either that the 'threat' of persecution was not country-wide or that he was not a serious target of political violence." It is unclear whether the BIA meant, by making this finding, to indicate its agreement with the IJ's internal resettlement analysis. A straightforward reading of the BIA's decision indicates that, rather than making an internal resettlement determination, it merely found that Vente's prior residence in Cali was evidence that he had not suffered past persecution.

Thus, to the extent that the BIA appears not to have made an explicit finding that Vente did not have a well-founded fear of persecution because he could relocate to Cali, his argument misconstrues the BIA's decision. We note, however, that Vente's residence in Cali from 1993 to 1998, long before he received the threats on which his asylum claim is based, is quite irrelevant to whether he suffered past persecution due to the threats and to whether relocation to Cali (or another part of Colombia) was a reasonable possibility for him after he received the threats. We also do not believe that Vente's brief residence

17

in Cali, which was apparently without incident, prior to his departure from Colombia in 2001 determines whether he has a reasonable possibility of relocating to Cali.

On remand, we encourage the BIA, if it deems necessary an inquiry into Vente's potential for internal relocation within Colombia, to be more explicit in its reasoning on this issue and to look only at the resettlement possibilities that currently exist for Vente without reference to his place of residence there before he received the threats at issue in his asylum claim. We also reiterate that, on remand, it is Vente's obligation to demonstrate that he would not have avoided future persecution by relocating to Cali in 2001, however brief that relocation may have been.

## IV. Conclusion

Although Vente's argument that the BIA should have conducted an independent corroboration analysis in his case is unpersuasive, he is correct that the BIA mischaracterized the nature of his asylum claim. Because the BIA's reasoning in denying Vente's asylum claim on the ground that he does not have a well-founded fear of persecution if returned to Colombia is without grounding in the record, and because we are unable to discern why the BIA chose to focus in its decision on issues that were at most tangentially relevant to Vente's claim, we grant the petition for review and remand this case to the BIA for further proceedings consistent with this opinion. *See INS v.*

*Ventura*, 537 U.S. 12, 16 (2002) (per curiam).